[No. 3454. Oct. 17, 1929.]

STATE v. STATE BOARD OF FINANCE et al.

[281 Pac. 456.]

John J. Kenney, of Santa Fe, (F. A. Catron, of Santa Fe, of counsel), for the State.

C. H. Gilbert, of Santa Fe, for appellees.

W. B. Walton and R. M. Wiley, both of Silver City, amici curiæ.

## OPINION OF THE COURT

SIMMS, J. Appeal from an order denying an injunction sought to prevent the state board of finance from issuing debentures pursuant to chapter 4 of the Laws of 1929.

During territorial days, the counties of Santa Fe and Grant and the town of Silver City each issued certain bonds which were afterwards found to be in excess of their powers and void. The case of Lewis v. Pima County, 155 U. S. 55, 15 S. Ct. 22, 39 L. Ed. 67, having established the unlawful and invalid status of similar bonds, Congress, in the exercise of its plenary power and authority over the territory and its municipal subdivisions, by the Act of January 16, 1897 (29 Stat. 487), validated these bonds and required the counties and town, respectively, to assume and pay them. In view of this action by Congress, when the question of the admission of New Mexico into the Union as a state was favorably decided, Congress, by the terms of the Act of June 20, 1910 (36 Stat. 557), known as the Enabling Act, donated to this

state 1,000,000 acres of land in trust for the purpose of, paying the unpaid principal and interest of the bonds of these two counties which the new state was required to ·assume. This action by Congress disposed of the debts of the two counties, so far as these unpaid bonds and interest were concerned. The first State Legislature, by chapter 16, Laws of 1912, provided for the issuance of bonds of this state to take up the unpaid bonds and interest of the two counties, and by chapter 71 of the Laws of 1912 undertook also to authorize bonds to be issued for the purpose of reimbursing Grant and Luna counties (the latter and Hidalgo carved out of Grant since statehood) for the interest paid on these bonds. This signified a legislative decision that such was a proper method and use of the trust fund. In the case of United States v. Marron, State Treasurer of New Mexico (not officially reported), the District Court of the United States for the District of New Mexico enjoined the carrying out of the provisions of chapter 71, supra, on the ground that the Enabling Act did not contain any provisions authorizing the repayment of the counties for interest paid by them.

Thereafter, by Act of June 5, 1920 (chapter 236, 2d Sess. 66th Cong., 41 Stat. 947), Congress granted per·mission for the state to pay the counties of Grant, Luna, Hidalgo, and Santa Fe and the town of Silver City out of the proceeds of the 1,000,000 acres granted by the Enabling Act, thus curing, so far as the national government could, the defect pointed out by the United States court. By chapter 6, Laws of 1921, the Legislature of this state undertook to act upon this congressional consent and issue the Series C bonds, proposing to retire both principal and interest thereof out of the proceeds of the 1,000,000-acre grant. We held, however, in the case of Bryant v. Loan Commissioners, 28 N. M. 319, 211 P. 597, that the Act of 1921 was ineffective for the reason that article 19 of the Constitution of this state prohibited the enforcement of this change in the purpose of the grants made by the Enabling Act, without a constitutional amendment; because it required the consent of Congress, which had been obtained, and also the consent of the people of this state to amend their Constitution, which had

not been obtained. A full and complete discussion of the historical background, as well as the particular question involved in that litigation, will be found in the case of Bryant v. Loan Commissioners, supra.

■ By Act of May 28, 1928, chapter 812, U. S. Statutes at Large, 70th Congress, 1st Session (45 Stat. 775), Congress donated an additional 250,000 acres of land to this state in trust for the purpose of repaying to the counties of Grant, Luna, Hidalgo, and Santa Fe, and to the town of Silver City, the full amount of this previously paid bond interest, and, in the case of the town, to pay the principal of a bond issue which it had outstanding and which grew out of circumstances practically the same. The material portions of this latest granting act of Congress are as follows:

"Sec. 1. That there is hereby granted * * * in trust, for the reimbursement of Grant, Luna, and Hidalgo Counties for interest paid by said counties * * * and for the reimbursement of Santa Fe County for interest paid by said county * * * and also for the payment of the principal of the bonds issued by the town of Silver City * * * and to reimburse said town of Silver City for interest paid. * * * Provided, That if there shall remain any of the two hundred and fifty thousand acres of land so granted, or of the proceeds of the sale or lease thereof, or rents, issues, or profits therefrom, after the payment of said items and debt, such remainder of lands and the proceeds of sales thereof shall be added to and become a part of the permanent school fund of said state.

"Sec. 2. That the said lands shall be selected in the same manner as provided for the selection of lands granted to the State of New Mexico by an Act of * ** Congress * * * (the Enabling Act) and such lands shall be leased and sold in such manner and under such limitations and restrictions as are provided in the said Act. * * *

"Sec. 3. Said State of New Mexico through its State Board of Finance shall determine the interest paid by said counties on said indebtedness, and the manner of liquidating the same, and likewise the amount of the principal due on the bonds issued by the town of Silver City, and the interest paid by said town and the manner of liquidating the same."

By chapter 4 of the Laws of 1929, the state accepted the gift from Congress, in trust, and consented to the provisions thereof, and authorized the state board of finance to issue debentures against the trust fund to be created and composed of the moneys derived from the sale and lease or other income from such donated lands,

if, in its judgment, the board should decide that such was the best and most advisable manner of liquidation. It is to prevent the issuance and sale of these debentures that this suit was brought.

Appellant says that the language of the act of Congress is not sufficiently broad to authorize the state board of finance to anticipate the proceeds of the grant by the debenture method proposed.

First, we should examine the language of the grant. Several things are too plain for argument. Among them we see that land is granted to be sold or leased for money; that debts are to be computed and paid in money, and if anything be left over, it goes in land or money to the common schools of the state. It is to be presumed that Congress understood the established practice of selling or leasing such lands, and expected and consented, by making the grant, that they should be sold or leased upon the ordinary terms, and, in case of sales, terms running over many years. At prevailing rates, if every acre of this quarter million acres were leased, after the usual expense deductions were made, it would take approximately half a century to pay the $400,000 to which the debts designated for payment now amount. And if sold over 30 years' time, as is usual, these lands would not discharge the debts to the counties and city named as beneficiaries for several decades. If Congress had intended for this course to be adopted, it could easily have said that the proceeds should be annually divided and prorated among the beneficiaries. This would have permitted the state board of finance to compute the debts and finish its work. But Congress laid a burden and responsibility on the board. It is required to determine "the manner of liquidating" these debts. As to this, it evidently has discretion. What can it decide? Not the medium of payment, for that is money. Not the beneficiaries, for they are fixed and the amount of their claims is a mere matter of computation. It is evident that it must decide both how and when to pay. The state board of finance is the obvious repository of power for making such decisions. Its designation, in view of the nature of its duties and also in view of the well-known fact that the Commissioner

of Public Lands handles and controls the sale and leasing of this land, lends support to the contention that the carrying out of the purposes of Congress to repay these old claims by means of a land grant involves a financial transaction of some magnitude, properly cognizable by the board, and is not a mere matter of dividing the proceeds as they come in from the land. Unless the terms "manner of liquidating" are given the foregoing meaning, we cannot see what useful purpose they can serve in the act.

■ And we believe that Congress itself has construed a similar grant to the one here in question in such a manner as to make the construction we have placed upon this one both proper and mandatory upon us. By section 7 of the Enabling Act (36 Stat. 562), 1,000,000 acres of land were granted with which to pay certain debts specified, with the provisions, as here, that any residue should go to the common schools. By chapter 71 of the Laws of 1912, our Legislature proposed to pay the identical debts we are now concerned with and adopted a bond issue, Series C, as the method of raising the money. It proposed to repay these bonds, both principal and interest, out of the land proceeds. In United States v. Marron, it was held that the debts to be paid were not included within the objects specified by the Enabling Act. By the Act of 1920, Congress gave its consent to the use of the proceeds mentioned for paying the debts proposed to be paid by the Legislature, and in 1921, by chapter 6 of the Laws of that year, our Legislature again proposed to use the proceeds of land sales for retirement of both principal and interest of the proposed bonds. In Bryant v. Loan Commissioners, supra, this court barred the way on the ground that the constitutional amendment necessary had not been adopted. Finally, in 1928, Congress, in face of the history of this matter running over 17 years filled with litigation and dispute, sought to solve the problem by donating a quarter million acres of land and directed the payment of these debts. Thus it removed the question of the propriety of the object for it established a new trust especially for that object. It had abundant notice that the plan proposed was one which involved the raising of the whole of the necessary money upon debentures; it could easily

have forbidden such a course. But it did not. The act is silent on the subject. The Attorney General of the United States, who is charged with the duty of protecting this trust from being despoiled, has never questioned the propriety of the plan proposed, so far as we know. Since Congress has indicated its approval of the use of the land proceeds for the payment of both principal and interest of bonds in a similar trust and has made this trust subject to the restrictions imposed upon that one, we feel justified in saying that it has construed the grant in harmony with the construction we here announce. United States v. Cerecedo Hermanos Y Compania, 209 U. S. 339, 28 S. Ct. 532, 52 L. Ed. 821.

█ Appellant next contends that by pledging the proceeds to be derived from sale and lease of these lands for the retirement of both principal and interest of the debentures, the Legislature has authorized the state board of finance to do a thing which violates the trust imposed upon these lands. It is said that the restrictions of the Enabling Act with reference to mortgaging lands are made applicable to these lands (Enabling Act, § 10), and the plan proposed by chapter 4 of the Acts of 1929 contravenes the terms of the trust. But if such restrictions of the Enabling Act should apply, it will be immediately noticed that no mortgage is proposed. The title to these lands is not to be incumbered in any way. The purpose of Congress undoubtedly was that the proceeds of sales and leases be paid out to the beneficiaries at one time or another. This is no permanent trust fund like that provided for the several educational institutions by the Enabling Act. This trust contemplates the use of the corpus in paying debts specified. While the inhibition against mortgaging is a wise one, and no doubt applies, we have heretofore held that pledging the income from the proceeds of the sales of land held in trust under the Enabling Act did not have the effect of mortgaging the land itself. State v. Regents, 32 N. M. 428, 258 P. 571.

█ But it is contended that there is no right to mortgage the proceeds of these lands, since such proceeds are subject to the same trusts as the land producing the same. While it is at least doubtful whether the plan proposed

amounts to anything more than a contract with the purchasers of the debentures that the money derived from these lands will be faithfully applied to the payment of principal and interest of the debentures as they mature, yet, if we concede for the sake of the argument that the provisions of the Enabling Act apply and the proposed plan involves pledging these proceeds from the lands, we fail to find any prohibition in the Enabling Act. This trust is one which is to be used for paying off debts and then it terminates. The corpus must be spent, not retained. And applying the money proceeds to these debts is the application to the objects named by Congress. The prohibition against mortgaging the lands themselves, and thereby running the risk of losing them for a fraction of their value, has no application to the money proceeds, because, once the lands are converted into money, all danger of loss or dissipation thereof is eliminated, so long as the funds are honestly and faithfully handled. And this plan has met with approval even in case of one of the permanent trusts, in which instance the money proceeds from the renting of grazing lands (not part of the permanent fund but subject to the same trust as the land itself) were pledged to retire both interest and principal of bonds. State v. Regents, 32 N. M. 428, 258 P. 571.

And, finally, appellant says that paying interest on debentures out of the proceeds of these lands, in addition to the amount of the debts themselves, works an injustice upon the common school fund which is to receive whatever of land or money may remain after the debts specified are paid. It claims that such a plan deprives the residuary beneficiary, if we may use the term, of a large sum of money without any lawful right to do so. We cannot consider the position of the permanent school fund in this matter as anything else than that of a contingent beneficiary to whom shall go whatever may be left over. Congress was obliged to provide some way to clear this trust from the state land office ultimately. It was inevitable that some fractional pieces of land or something in money should be on hand when such a task was completed. Where should it go? Should the land office charge it off to get rid of it, and, if so, how was the ac-

counting to be done? The permanent school fund is to receive as a gratuity whatever may be left over, if anything. If the lands donated should not be sufficient to pay the debentures and interest in full, there will be no residue for the permanent school fund. That fund has no such standing as entitles it to hamper or obstruct the state board of finance in the exercise of its sound judgment as to what is the best manner of liquidating the debts.

We therefore conclude that chapter 4 of the Laws of 1929, which authorizes the board of finance in its judgment to issue debentures, and the decision of the board itself to adopt that manner of liquidating the debts mentioned, is not in violation of the act of Congress, and the trial court was correct in dismissing plaintiff's complaint.

The judgment should be affirmed, and it is so ordered.

BICKLEY, C. J., and WATSON, and PARKER, JJ., concur.

CATRON, J. (dissenting). The decisive question in this case is whether or not, under the terms of the trust created by chapter 812, 45 U. S. Statutes at Large, 70th Congress, First Session, p. 775, the state board of finance of the state of New Mexico can, out of the proceeds from the corpus of the trust, pay interest on the proposed issue of debentures.

The act of Congress granted certain lands in trust for the specific purposes enumerated in section 1 thereof, and further provided that such lands shall be leased and sold in such manner and under such limitations and restrictions as are provided in the enabling act; that the state of New Mexico, through its state board of finance, shall determine the amount of the claims of the beneficiaries and the manner of liquidating same.

The act does not contain any provision for the acceleration of payment of the calims of beneficiaries by means of the sale of debentures, nor does it include the payment of interest on said debentures among the specific purposes in the trust enumerated, nor authorize such payment

out of the corpus of the trust or the proceeds derived from the lease and sale thereof.

It is not indispensable to the carrying out of the trust that payment be made to the counties and city by means of moneys derived from the sale of debentures which pledge the proceeds hereafter to be derived from the leasing and selling of the lands of the trust. Congress, as is evident from the language of the trust, contemplated that sufficient funds would, and could, be raised with which to reimburse the counties and city by the leasing and sale of the corpus of the trust, in the manner in said act provided. Had Congress any doubt as to this, it could easily have provided, and undoubtedly would so have done, for some method by which funds might more quickly be raised and made available to reimburse the counties and city. Certainly the trust could have been made as broad as Congress deemed necessary under all the circumstances. Especially is this true if, as the majority opinion states, Congress had abundant notice that the plan proposed was one which involved the raising of the whole of the necessary money upon debentures.

That the method prescribed in the trust could not at an early date be carried out to the extent of discharging same could not have been foreseen by Congress, but that does not destroy the trust nor prevent its being carried out in the future when conditions are more favorable and when the lands can be sold and the necessary funds raised in that manner. Nor does such fact authorize this court to enlarge and extend the trust beyond its specific terms so that interest may be paid on the debentures sought to be issued at the present time.

Trusts are to be strictly construed, and the specific purposes, conditions, and terms thereof may not be enlarged or extended unless the necessity therefor is clearly implied and intended by the language used. No such necessity, implication, or intendment is to be found in the language creating the trust. If debentures are not issued and interest thereon paid out of the proceeds derived from the body of the trust, nevertheless it can ultimately be carried out and discharged in accordance with its specific terms.

The present call for the proposed issue of debentures is not a necessity but merely a matter of convenience to and accommodation of certain beneficiaries, an acceleration of payment to them.

The "manner of liquidating" is left to the discretion of the state board of finance, but only in so far as the manner adopted does not violate the terms of the trust and the clear and necessary intendment thereof. Such discretion cannot, however, be so exercised as to enlarge and extend the terms of the trust and thereby in effect create a new and different one. To hold that the proposed debentures may be issued and interest thereon paid out of the proceeds of the corpus of the trust is, in my opinion, an unauthorized and unjustifiable enlargement and extension thereof.

The position I take is not destructive of the trust but, on the contrary, the preservation of the integrity thereof. I therefore find it impossible to concur in the majority opinion, and I dissent.